Gerardo H. Gonzalez  SBN 032699
Dinita L. James SBN 025253
**GONZALEZ LAW, LLC**
60 East Rio Salado Parkway, Suite 900
Tempe, AZ 85281
Telephone:    480-565-6400
Facsimile:    480-565-6401
E-mail: jerry.gonzalez@gnzlaw.com
E-mail:  dinita.james@gnzlaw.com
*Attorneys for Defendants The Kroger Co. and*
*Kroger Limited Partnership II*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## PRESCOTT DIVISION

KINGMAN HOSPITAL INC., ARIZONA
SPINE AND JOINT HOSPITAL LLC;
BULLHEAD CITY HOSPITAL
CORPORATION; CARONDELET ST.
JOSEPH'S HOSPITAL; HOLY CROSS
HOSPITAL, INC.; HOPSITAL
DEVELOPMENT OF WEST PHOENIX,
INC.; NORTHWEST HOSPITAL, LLC;
OASIS HOSPITAL; ORO VALLEY
HOSPITAL, LLC; ORTHOPEDIC AND
SURGICAL SPECIALTY COMPANY,
LLC; ST. MARY'S HOSPITAL OF
TUCSON; VHSACQUISITION
SUBSIDIARY NUMBER 1, INC.; and
VHS OF ARROWHEAD, INC.,

                    Plaintiffs,

v.

PURDUE PHARMA, L.P.; PURDUE
PHARMA, INC.; THE PURDUE
FREDERICK COMPANY; RICHARD
SACKLER; BEVERLY SACKLER; DAVID

NO. _____


**Removed from Mohave Superior Court,
Case No.  S8015cv201900563**

SACKLER; ILENE SACKLER
LEFCOURT; SACKLER; KATHE
SACKLER; MORTIMER D.A. SACKLER;
THERESA SACKLER; JOHN STEWART;
MARK TIMNEY; CRAIG LANDAU;
RUSSELL GASDIA; AMNEAL
PHARMACEUTICALS, LLC; AMNEAL
PHARMACEUTICALS, INC.; TEVA
PHARMACEUTICAL INDUSTRIES,
LTD.; TEVA PHARMACEUITCALS USA,
INC.; CEPHALON, INC.; JOHNSON &
JOHNSON; JANSSEN
PHARMACEUTICALS, INC.; JOHNSON
PHARMACEUTICA, INC. n/k/a JANSSEN
PHARMACEUTICALS, INC.; ABBOTT
LABORATORIES; ABBOTT
LABORATORIES, INC.; ASSERTIO
THERAPEUTICS, INC.; ENDO HEALTH
SOLUTIONS, INC.; ENDO
PHARMACEUTICALS, INC.;
MALLINCKRODT, LLC;
MALLINCKRODT PLC; SPECGX, LLC;
ALLERGAN PLC; WATSON
LABORATORIES, INC.; ACTAVIS LLC;
ACTAVIS PHARMA, INC.; ANDA, INC.;
H.D. SMITH, LLC f/k/a H.D. SMITH
WHOLESALE DRUG CO.; HENRY
SCHEIN, INC.; AMERISOURCEBERGEN
DRUG CORPORATION; MIAMI-LUKEN,
INC.; CARDINAL HEALTH, INC; RIT
RITE AID OF MARYLAND, INC.; THE
KROGER CO.; KROGER LIMITED
PARTNERSHIP II; CVS HEALTH
CORPORATION; CVS PHARMACY
INC.; CVS INDIANA, L.L.C.; WAL-
MART INC.; WAL-MART STORES
EAST, L.P.; NORAMCO, INC.; and
WALGREENS BOOTS ALLIANCE, INC.,

Defendants.

2

In accordance with 28 U.S.C. §§ 1331, 1367, 1441 and 1446, Defendants Kroger Limited Partnership II and the Kroger Co. (collectively, "Kroger") remove this action to this Court from the Superior Court of the State of Arizona in and for the County of Mohave.   As grounds for removal, Kroger states that the action presents substantial questions of federal law.

## I.      Nature of Removed Action

1.      The Plaintiffs in this action are Kingman Hospital, Inc., Arizona Spine and Joint Hospital, LLC, Bullhead City Hospital Corporation, Carondelet St. Joseph's Hospital, Holy Cross Hospital, Inc., Hospital Development of Phoenix, Inc., Northwest Hospital, LLC, Oasis Hospital, Oro Valley Hospital, LLC, Orthopedic and Surgical Specialty Company, LLC, St. Mary's Hospital of Tucson, VHS Acquisition Subsidiary Number 1, Inc., and VHS of Arrowhead, Inc. ("Plaintiffs").

2.      On June 18, 2019 Plaintiffs filed a Complaint ("Complaint").

3.      This action was assigned to the Honorable Eric Gordon of the Superior Court of the State of Arizona in and for the County of Mohave.

4.      The Complaint asserts claims against four groups of Defendants.

5.      The first group consists of individuals: Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Kathe Sackler, Mortimer D.A. Sackler, Theresa Sackler, John Stewart, Mark Timney, Craig Landau, and Russell Gasdia.

6.      The second group of defendants consist of the "Manufacturer Defendants": Purdue Pharma, L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Amneal Pharmaceuticals, LLC, Amneal Pharmaceuticals, Inc., Teva Pharmaceutical Industries, Ltd. (incorrectly named as "Teva Pharmaceutical Industries, Ltd." in the Complaint), Cephalon, Inc., Johnson & Johnson, Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., n/k/a Janssen Pharmaceuticals Inc., Abbott Laboratories, Abbott Laboratories, Inc., Assertio Therapeutics, Inc., Endo Health Solutions Inc., Endo Pharmaceuticals Inc., Noramco, Inc., Mallinckrodt, LLC, Mallinckrodt PLC, Specgx, LLC, Allergan PLC, Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc.

7.     The third group of defendants consist of the "Distributor Defendants": AmerisourceBergen Drug Corporation, Miami-Luken, Inc., Cardinal Health, Inc., Anda, Inc., H.D. Smith, LLC f/k/a H.D. Smith Wholesale Drug Co., and Henry Schein, Inc.

8.     The fourth group of defendants are the "National Retail Pharmacies": Rite Aid of Maryland, Inc., The Kroger Co., Kroger Limited Partnership II, CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, L.L.C., Walmart, Inc., Walmart Stores East L.P., and Walgreens Boots Alliance, Inc.

9.     Although Plaintiffs assert state law causes of action, Plaintiffs plead, among other things, that the Distributor Defendants and National Retail Pharmacies Defendants (collectively, the "Supply Chain Defendants") "saw the profit potential in the opioid sales, participated in the conspiracy by ignoring their legal responsibilities under the Controlled Substances Act, and flooded affected areas with opioids while knowing they were contributing to, but profiting from, widespread addiction and human misery." *See,* Complaint, ¶ 14. Further, the Plaintiffs plead that "Defendants' practice of continually filling opioid prescriptions, including from suspicious prescribers, and failing to report suspicious orders of opioids has enabled an oversupply of opioids to communities, including in the regions that Plaintiffs serve." *See,* Complaint, ¶ 23.

10.     Because the duties governing the reporting and shipping requirements arise, if at all, from the federal Controlled Substances Act, ("CSA"), and its implementing regulations, Plaintiffs' allegations of violations of federal law form the basis for its claims. As set forth *supra,* these alleged violations of federal law are asserted to all groups of Defendants in the Complaint.

11.     On December 5, 2017, the Judicial Panel of Multidistrict Litigation ("JPML") formed a multidistrict litigation ("MDL") and transferred opioid-related actions to the Honorable Dan A. Polster of the Northern District of Ohio pursuant to 28 U.S.C. § 1407. *See, In re Nat'l Prescription Opiate Litig.,* 290 F. Supp. 3d 1375 (J.P.M.L. 2017). More than 2,000 opioid-related actions are pending in the MDL, including actions transferred from this Court.

12.     Defendants intend to tag this case immediately for transfer to the MDL pursuant to J.P.M.L Rule 7.1.

13.     In accordance with 28 U.S.C. § 1446(a) and L.R. Civ. 3.6(b), copies of the public access docket sheet as of August 15, 2018 and true and complete copies of all pleadings and other documents filed in the state court proceeding that were available for public access are attached as **Composite Exhibit A**.  Undersigned counsel verifies that Composite Exhibit A is complete as of August 15, 2019, when an agent acting on her behalf attempted to obtain copies of all documents filed in the state court proceeding. Through relayed messages, undersigned counsel understands that her agent was told that certain the filings listed on the public access docket were not then publicly available, although it is not clear which ones are not available and why.Undersigned counsel will follow up with the clerk of the state court to obtain the remaining filings as well as any additional documents filed in the intervening period between the agent's visit to the clerk and the filing of this Notice of Removal.

## II.     Timeliness of Removal

14.     Plaintiffs served the Complaint on The Kroger Co. on July 19, 2019. Plaintiffs served the Complaint on Kroger Limited Partnership II on July 18, 2019.

15.     In accordance with 28 U.S.C. § 1446(b), this notice of removal is timely filed within 30 days of service of Plaintiffs' Complaint.  *See, Murphy Bros., Inc., v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 354-356 (1999) (30-day removal period begins to run upon service of summons and complaint).  Further, the Ninth Circuit has joined the Fourth Circuit in holding that the thirty-day removal clock under 28 U.S.C. § 1446(b)(1) "does not begin upon service on and receipt by a statutorily designated agent, and began in this case only when [a defendant] actually received the . . .  complaint." *Anderson v. State Farm Mut. Auto. Ins. Co.,* 917 F.3d 1126, 1130 (9th Cir. 2019) (citing *Elliott v. Am. States Ins. Co.,* 883 F.3d 384, 394 (4th Cir. 2018)).

16.     "If defendants are served at different times, and a later-served defendant files a notice of removal, any earlier served defendant may consent to the removal even

though that earlier-served defendant did not previously initiate or consent to removal."  28 U.S.C. § 1446(b)(2)(C).

17.    Kroger has not responded to the Complaint in state court.   Undersigned counsel understands that Plaintiffs have agreed to an extension until October 1, 2019 for all Defendants to respond to the Complaint in state court.

### III.    Propriety of Venue

18.    Venue is proper in this district under 28 U.S.C. § 1441(a) because the state court where the suit has been pending is in this district.

### IV.    Basis of Removal

19.    Removal is proper pursuant to 28 U.S.C. §§ 1331 and 1441 because Plaintiffs' claims present substantial federal questions under the CSA, 21 U.S.C. § 801, et seq.

20.    The original jurisdiction of the district courts includes jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

21.    "The general federal question jurisdiction statute, 28 U.S.C. § 1331, grants federal district courts 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'  A case arise[es] under federal law within the meaning of § 1331 ... if a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  *Cook Inlet Region, Inc. v. Rude*, 690 F.3d 1127, 1130 (9th Cir. 2012) (citing *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 689-90 (2006) (internal quotation marks omitted); *Holmes Grp., Inc., v. Vornado Air Circulation Sys., Inc.,* 535 U.S. 826, 830 (2002)).

22.    Even when state law creates the causes of action, a complaint may raise a substantial question of federal law sufficient to warrant removal if "vindication of a right under state law necessarily turn[s] on some construction of federal law."  *Merrell Dow Pharm. Inc. v. Thompson,* 478 U.S. 804, 808-09 (1986) (citation omitted); *see also Gully*

6

*v. First Nat'l Bank*, 299 U.S. 109, 112 (1936) ("To bring a case within [§ 1441], a right or immunity created by the U.S. Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action;")[1] *see also Ethridge v. Harbor House Rest*., 861 F.2d 1389, 1394 (9th Cir. 1988).

23.     "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton,* 568 U.S. 251, 258 (2013); *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 315 (2005); *Cook Inlet Region, Inc. v. Rude*, 690 F.3d 1127, 1130 (9th Cir. 2012); *Indep. Living Ctr. of S. California, Inc. v. Kent*, 909 F.3d 272, 279 (9th Cir. 2018).

24.     "Where all four of these requirements are met . . . jurisdiction is proper because there is a 'serious' federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Gunn,* 568 U.S. at 258.

---

[1]A defendant need not overcome any artificial presumptions against removal or in favor of remand.  In *Breuer v. Jim's Concrete of Brevard, Inc.,* 538 U.S. 691 (2003), the Supreme Court unanimously held that the 1948 amendments to the general federal removal statute, 28 U.S.C. §1441(a), trumped the Court's instructions in *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100 (1941), that federal jurisdictional statutes must be strictly construed against any recognition of federal subject matter jurisdiction, with every presumption indulged in favor of remand.  *Id* .at 697-98.  ("Whatever apparent force this argument [of strict construction against removal] might have claimed when *Shamrock* was handed down has been qualified by later statutory development…. Since 1948, therefore, there has been no question that whenever the subject matter of an action qualifies it for removal, the *burden is on a plaintiff to find an express exception."*  (emphasis added)); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 558 (2005) (construing 1990 enactment of 28 U.S.C. § 1367, authorizing supplemental federal subject matter jurisdiction, and holding: "We must not give jurisdictional statutes a more expansive interpretation than their text warrants; but it is just as important not to adopt an artificial construction that is narrower than what the text provides . . . .Ordinary principles of statutory construction apply." (citation omitted)).

In *Mims v. Arrow Financial Services, LLC,* the Court held: "Divestment of district court jurisdiction should be found no more readily than divestment of state court jurisdiction, given the longstanding and explicit grant of federal question jurisdiction in 28 U.S.C. § 1331."  565 U.S. 368, 379 (2012) (internal quotation marks and alterations omitted).

25.   As set forth below, this case meets all four requirements.[2]

26.   Although Plaintiffs plead some of theories to recovery against Defendants as state law claims, they base the underlying theory of liability on the Supply Chain Defendants' alleged violations of federal law or alleged duties arising out of federal law, specifically the CSA, i.e., that a portion of their otherwise lawful shipments of prescription opioids were unlawful because they were shipped in fulfillment of suspicious orders that Defendants allegedly had a duty to identify, report, and then not ship.

27.   The source of the asserted legal duty to monitor and report suspicious orders of controlled substances is the CSA, 21 U.S.C. §§ 801 *et seq.,* and its implementing regulations. *See, e.g.,* Complaint at ¶ 776 (alleging that the "National Retail Pharmacies, like manufacturers and other distributors, are registrants under the CSA. 21 C.F.R. § 1301.11," and that "pharmacy registrants are required to provide effective controls and procedures to guard against theft and diversion of controlled substances," citing 21 C.F.R. § 1301.71(a).)

28.   Further, Plaintiffs alleged that "[d]espite their legal obligations as registrants under the CSA, the National Retail Pharmacies allowed widespread diversion to occur – and they did so knowingly.  They knew they made money by filling prescriptions, not by not filling descriptions.  They knew they made money by making it easy for doctors to refer patients with drug prescriptions to them to fill, not by making it difficult for doctors to refer patients to them to fill descriptions." *See,* Complaint at ¶ 783.

29.   The source of the asserted legal duty to suspend shipments of suspicious orders is 21 U.S.C. § 823(b) and (e), as interpreted by the Drug Enforcement Administration ("DEA") of the United States Department of Justice.  Specifically, the DEA interprets the public interest factors for registering distributors under the C.S.A., 21 U.S.C. § 1301 823(b) and (e), to impose a responsibility on distributors to exercise due

---

[2]The substantiality inquiry as it pertains to federal question jurisdiction is distinct from the merits of the case and has no bearing on the strength of Plaintiffs' underlying claims. *See Gunn v. Minton,* 568 U.S. 251, 260 (2013) ("The substantiality inquiry under *Grable* looks . . . . to the importance of the issue to the federal system as a whole.")

diligence to avoid filling suspicious orders that might be diverted to unlawful uses. *See Masters Pharm., Inc., v. DEA,* 861 F.3d 206, 212-13 (D.C. Cir. 2017) (citing *In re Southwood Pharm., Inc.,* Revocation of Registration, 72 Fed. Reg. p. 36487, 36501, 2007 WL 1886484 (DEA July 3, 2007), as source of the DEA's "Shipping Requirement"). *See, e.g.* Complaint at ¶ 782-790 (alleging that the National Retail Pharmacies distributed suspicious prescription opioid orders even though they "were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.")

30.     Plaintiffs' theories of liability against the Supply ChainDefendants, as pled in the Complaint, are predicated on allegations that they breached alleged duties under the CSA to implement effective controls to detect and report "suspicious" orders for prescription opioids and – crucial to Plaintiffs' claims – to refuse to ship such orders to Arizona pharmacies.

31.     Specifically, Plaintiffs invoke federal law and alleges that the Supply Chain Defendants violated federal law with, among others, the following allegations:

    i.    "[D]efendants failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into communities across America." *See,* Complaint at ¶ 631.

    ii.    "Defendants continued to pump massive quantities of opioids into communities in disregard of their legal duties to control the supply, prevent diversion, and report and take steps to halt suspicious orders." *Id.* at ¶ 631.

    iii.    "The Distributor Defendants owe a duty under, *inter alia*, Arizona common law and statutory law, to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted." *Id,* at ¶ 671.

iv.   "The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders." *Id.* at ¶ 690.

v.   "The DEA also repeatedly reminded the Defendants of their obligation to report and decline to fill suspicious orders." *Id.* at ¶ 692.

vi.   "Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers from which the Distributor Defendants knew prescription opioids were likely to be diverted." *Id.* at ¶ 693.

vii.   "The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted." *Id.* at ¶ 706.

viii.   "The Distributor Defendants failed to act to suspend customers from ordering controlled substances, let alone terminate their accounts, even after compliance staff had blocked and reported dozens, or even hundreds, of suspicious orders from those customers." *Id.* at ¶ 712.

ix.   "Throughout the country, the National Retail Pharmacies demonstrate were or should have been aware of numerous red flags of potential suspicious activity and diversion." *Id.* at ¶ 822.

32.   Although Plaintiffs cite to Arizona's Uniform Controlled Substances Act, A.R.S. § 36-2501 et seq., as the source of law governing the distribution of prescription opioids, *see,* Complaint at ¶¶ 188-190, Plaintiffs do not identify a state law source for the duty to report, halt, or "refuse to fill" suspicious orders.

33.   Here, the substantial federal questions arise from the interconnectedness of the Arizona Uniform Controlled Substances Act ("Arizona UCSA"), the federal CSA, and the DEA's regulatory framework.  Plaintiffs' Complaint as a whole hinges on the asserted duty to identify and report suspicious orders.  As mentioned previously, the source of the asserted legal duty to suspend shipments of suspicious orders is 21 U.S.C. § 823(b) and

(e), as interpreted by the DEA of the United States Department of Justice.  In 1979, the Arizona legislature, in Laws 1979, Chapter 103, "adopted the Uniform Controlled Substances Act, (Arizona UCSA") A.R.S. § 36-2501 et seq."  *State v. Superior Court In & For Pima Cty*., 128 Ariz. 535, 536, 627 P.2d 686, 687 (1981).  The Uniform Controlled Substances Act is designed for states to fulfill their function of licensing prescribers and pharmacies *consistent with and by incorporating the federal regulatory scheme.*[3]  The Arizona UCSA does so primarily by requiring Arizona licensees to be DEA registrants.  The Arizona UCSA and the Arizona state regulations implementing it also require compliance with all the recordkeeping and reporting requirements that are required to be a DEA registrant.  It is only by incorporating the federal regulatory scheme for DEA registrants under the federal CSA that the duty to report/suspend suspicious orders also becomes state law.  The state law at issue in the Complaint is overwhelmingly based on federal questions as to the interpretation and application of federal laws and federal regulations.

34.    Plaintiffs' theory of liability also relies on an expansive reading of federal law that calls into question an agency determination.  Plaintiffs allege not only that the Supply Chain Defendants should have detected and reported discrete suspicious orders, but that they should have recognized that the total volume of prescription opioids distributed throughout the State of Arizona was excessive.  *See,* Complaint at ¶ 18 ("The misrepresentations of Marketing Defendants and Supply Chain Defendants and others prompted Arizona health care providers to prescribe, patients to take, and payors to cover opioids for the treatment of chronic pain."), ¶ 49 ("Because opioids are very dangerous and highly addictive drugs, it was foreseeable to Defendants that the increase in the use of

---

[3] The Arizona UCSA cites the Uniform Controlled Substances Act and notes that "[s]everal provisions of the Uniform Controlled Substances Act (1990) are derived from the wording of the federal Controlled Substances Act. In most instances, deviations from the wording of the federal act are intended to improve readability, *with no change in substance.*" § 101. Unif. Controlled Substances Act 1990 § 101 (emphasis added). Further, § 201 of the Arizona UCSA states that "[t]he Act follows the federal Controlled Substances Act and lists all of the controlled substances in five schedules that are identical with the federal law." *See,* Unif. Controlled Substances Act 1994 § 201.

opioids would result in a corresponding epidemic of patients with opioid related conditions going to hospitals for treatment, including to Plaintiffs.")

35.     To succeed on that theory, Plaintiffs would thus have to challenge annual production quotas as being set at unlawfully high levels, such that the total quantity of prescription opioids that all pharmaceutical distributors distributed was such that diversion was inevitable. The total amount of prescription opioids distributed in any given year turns on annual aggregate production quotas established by the DEA.  Specifically, the DEA must "determine the total quantity of each basic class of controlled substances listed in Schedule I or II necessary to be manufactured during the following calendar year to provide for the estimated medical, scientific, research and industrial needs of the United States, for lawful export requirements, and for the establishment and maintenance of reserve stocks." 21 C.F.R. § 1303.11(a).  In making this determination, the DEA must consider "[p]rojected demand" for such substances.  21 C.F.R. §1303.11(b).  Thus, to show that the total quantity of prescription opioids that the Supply Chain Defendants distributed was unreasonable, Plaintiff would have to show that the annual aggregate production quotas set by the DEA, pursuant to a federal statute, were themselves unreasonable.[4]

36.     The federal questions presented by Plaintiffs' claims therefore are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn,* 568 U.S. at 258; *Hornish v. King Cty.*, 899 F.3d 680 (9th Cir. 2018), *cert. denied sub nom. Kaseburg v. Port of Seattle*, 139 S. Ct. 1546, 203 L. Ed. 2d 712 (2019); *Indep. Living Ctr. of S. California, Inc. v. Kent*, 909 F.3d 272, 279 (9th Cir. 2018).

---

[4] Furthermore, 21 U.S.C. § 827(d)(1) requires the Distributor Defendants to report to the DEA "every sale, delivery or other disposal" by them of prescription opioids.  In other words, it has been the case for years that each Distributor Defendant has reported to the DEA the total volume of prescription opioids it distributed.  To succeed on its theory of liability that the total volume of prescription opioids was unreasonable, Plaintiffs would have to show that the Distributor Defendants' existing reporting to the DEA was inadequate.

37.    *First,* Plaintiffs' state law claims "necessarily raise" federal questions because "the right to relief depends upon the construction or application of federal law." *Cook Inlet Region, Inc. v. Rude*, 690 F.3d 1127 (9th Cir. 2012); *see also N. Carolina ex rel. N. Carolina Dep't of Admin. v. Alcoa Power Generating, Inc.,* 853 F.3d 140, 146 (4th Cir. 2017) ("Regardless of the allegations of a state law claim, 'where the vindication of a right under state law necessarily turns on some construction of federal law,' the claim arises under federal law and thus supports federal question jurisdiction under 28 U.S.C. § 1331(a) arises only if the complaint seeks a remedy expressly granted by federal law *or if the action requires construction of a federal statute,* or at least a distinctive policy of a federal statute requires the application of federal legal principles" (emphasis added)).

38.    As pleaded, Plaintiffs' claims against the Supply Chain Defendants require Plaintiffs to establish that they breached duties under federal law by failing to report and stop shipments of otherwise lawful orders of controlled substances into Arizona.

39.    Moreover, Plaintiffs' Complaint references and relies upon federal law throughout the entire Complaint, not just for the per se theory of one of their nine claims for relief. *See*, *e.g.,* Complaint ¶¶ 1009 (in claim for relief under the Arizona Consumer Fraud Act, alleging:  "Each of the Defendants have engaged in unfair and/or deceptive trade practices by omitting the material fact of its failure to design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders, as required Arizona's Uniform Controlled Substances Act, A.R.S. § 36-2501, et seq., Arizona rules 27 A.A.C. R4-23-604 and A.A.C. R4-26.-605, *and laws incorporated therein*." (emphasis added)); 1065(c) (in claim for relief for nuisance, alleging that Defendants' conduct "[i]s proscribed by statutes and regulation, including controlled substances and consumer protection statutes")); 1098(b), (f) (in fraud and deceipt claim for relief, alleging that the Supply Chain Defendants omitted material facts in "[t]hat they failed to report suspicious orders," and "[t]hat they failed to keep and maintain accurate records of Schedule II - V controlled substances)).

13

40.     For example, Plaintiffs allege that "the Marketing Defendants had control over the information regarding addiction they chose to spread and emphasize as part of their massive marketing campaign.  By providing misleading information to doctors about addiction being rare and opioids being safe even in high doses, then pressuring those doctors into prescribing their products by arguing, among other things, that no one should be in pain, especially chronic pain, the Marketing Defendants created a population of addicted patients who sought opioids at never-before-seen rates." *See,* Complaint, at ¶ 58. To establish public nuisance or negligence, Plaintiffs would have to show that the Distributor Defendants failed to report and halt suspicious orders for prescription opioids as purportedly required *by federal law*.  And, as noted, the alleged duty to halt or refuse to fill shipments of suspicious orders arises (if at all) under the federal CSA; the federal duties to report and not fill suspicious orders are merely incorporated into state law by requiring state licensees to have DEA registration, with its concomitant panoply of regulations to contradict diversion.  Thus, although plaintiffs are masters of their complaints, and they "may avoid federal jurisdiction by *exclusive* reliance on state law," *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 391 (1987) (emphasis added), Plaintiffs here allege violations of federal law as the basis for its purported state-law claims.[5]

41.     Similarly, Plaintiffs' claims that the Distributor Defendants shipped "excessive" quantities of prescription opioids into Arizona require Plaintiffs to show that the aggregate production quotas set by the DEA pursuant to a federal statute were improper.  *See Complaint,* at ¶¶ 633, 711.

---

[5] Furthermore, it is not necessary for federal jurisdiction that Kroger establish that all of Plaintiffs' claims against all Defendants raise a federal question.  Even if Plaintiffs could prove one or more of their claims without establishing a violation of federal law, this Court still has federal question jurisdiction: "Nothing in the jurisdictional statutes suggests that the presence of related state law claims somehow alters the fact that [the] complaints, by virtue of their federal claims, were 'civil actions' within the federal courts' 'original jurisdiction.'"  *City of Chicago v. Int'l College of Surgeons,* 522 U.S. 156, 166 (1997).

Because the Court has original jurisdiction over at least one count here, it has supplemental jurisdiction over Plaintiffs' remaining counts against the Supply Chain Defendants, which are so related that they "form part of the same case or controversy." 28 U.S.C. § 1367(a).

42.     In pleading its causes of action, Plaintiffs claim that the Marketing Defendants and Supply Chain Defendants "suppl[ied] opioids beyond what the market could bear, funnel[led] so many opioids into Arizona communities that the product could only have been diverted and used illicitly" and "contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know should be necessary for legitimate medical uses, while failing to report . . . suspicious orders when they were identified . . . ." *See*, Complaint, at ¶ 18; ¶ 57.

43.     But as noted, the annual aggregate production quotas for prescription opioids are established by the DEA under 21 C.F.R. § 1303.11.  The total amount of prescription opioids distributed by pharmaceutical distributors in any given year also turns on these aggregate quotas. Accordingly, to prevail on its claims, Plaintiffs need to show that the DEA's aggregate production quotas, set pursuant to a federal statute, were "excessive."   *See Complaint,* at ¶ 633; ¶ 711. Thus, Plaintiffs' causes of action "necessarily raise[] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Cook Inlet Region, Inc. v. Rude*, 690 F.3d 1127, 1130 (9th Cir. 2012) (citing *Grable*, 545 U.S. at 314).

44.     In sum, the Plaintiffs' Complaint necessarily raises federal issues – namely, whether the Supply Chain Defendants violated the CSA by failing to report, prevent or halt suspicious orders for prescription opioids, and whether production quotas set by the DEA under the CSA were excessive.

45.     *Second,* these federal issues are "actually disputed" because the parties disagree as to the existence and scope of alleged duties arising under the CSA and whether the Supply Chain Defendants violated their duties.  Indeed, these federal issues are the "central point of dispute."  *Gunn,* 568 U.S. at 259.

46.     *Third,* the federal issues presented by Plaintiffs' claims are "substantial." "The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole."  *Gunn,* 568 U.S. at 260.  Among other things, the Court must

assess whether the federal government has a "strong interest" in the federal issue at stake and whether allowing state courts to resolve the issue will "undermine the development of a uniform body of [federal] law." *Id.* at 260-262 (internal quotation and citation omitted). As the Supreme Court explained in *Grable,* "[t]he doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. at 312.

47.    Plaintiffs' theories of the Supply Chain Defendants' liability necessarily require that a court determine the existence and scope of the Distributor Defendants' obligations under federal law because regulation of controlled substances is first and foremost federal regulation.  Indeed, Congress designed the CSA with the intent of reducing illegal diversion of controlled substances, "while at the same time providing the legitimate drug industry with a *unified approach* to narcotic and dangerous drug control." H.R. Rep. No. 1444, 91st. Cong., 2nd Sess. 1970, *as reprinted in* 1970 U.S.C.C.A.N. 4566, 4571-72 (emphasis added).

48.    Plaintiffs' theories of the Supply Chain Defendants' liability thus "involve aspect of the complex federal regulatory scheme applicable to" the national prescription drug supply chain, *Broder v. Cablevision Sys. Corp.,* 418 F.3d 187, 195 (2d Cir. 2005), and are "sufficiently significant to the development of a uniform body of [controlled substances] regulation to satisfy the requirement of importance to the federal system as a whole," *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC,* 770 F.3d 1010, 1024 (2d Cir. 2014).

49.    The CSA itself notes that "illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people" and that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." 21 U.S.C. § 801.  Furthermore, minimizing uncertainty over reporting obligations under the CSA

"fully justifies resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312 (citing ALI, Study of the Division of Jurisdiction Between State and Federal Courts 164–166 (1968)).

50.     A "federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Id.*

51.     Plaintiffs' attempt to enforce the CSA raises substantial federal questions even though the CSA does not provide for a private right of action.  In 2005, in *Grable,* the Supreme Court held that lack of a federal cause of action does *not* foreclose federal-question jurisdiction.  The Court stated that applying *Merrell Dow* too narrowly would both "overturn [] decades of precedent," and "convert [] a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one." *Grable,* 545 U.S. at 317.

52.     Federal jurisdiction "demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Sullivan v. BNSF Ry. Co*., 447 F. Supp. 2d 1092, 1097 (D. Ariz. 2006).   While the *Sullivan* case held that "[a] mere citation to a federal act by the Plaintiffs does not implicate a substantial federal interest," here, by contrast, Plaintiffs cite the federal Controlled Substances Act throughout the entire Complaint. *Id.* (citing *Campbell v. Aerospace Corp.,* 123 F.3d 1308, 1315 (9th Cir.1997)).  In *Campbell*, the court held that a citation to a federal act in support of one of the elements of a tortious discharge claim did not create federal question jurisdiction because the citation did not implicate a "compelling federal judicial interest" nor did the citation "alter the fundamental nature of [the] state-law tort action."

53.     In the present case, Plaintiffs made far more than "mere references to federal regulations and guidelines to support their claim[s]." *Sullivan*, 447 F. Supp. 2d at 1097; *see, e.g.,* Complaint at ¶¶ 450,  634, 741, 776, 783, 793, 797, 800, 832, 864, 1027, 1038.  Thereby, unlike *Sullivan,* it is apparent that there is "a substantial [federal

question], indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum" here.  *Sullivan*, 447 F. Supp. 2d at 1097.

54.    Further, removal is particularly appropriate here because Plaintiffs' action is largely identical to the nearly 2,000 opioid-related actions pending in the MDL in the Northern District of Ohio.  Indeed, Plaintiffs acknowledge that opioid use and addiction is not merely a local issue, but a "national public health emergency," or "epidemic."  *See,* Complaint at ¶¶ 10, 205, 207.  The MDL judge, Judge Polster, is attempting to achieve a national solution to this nationwide problem.[6]

55.    *Fourth,* and finally, the federal issues also are capable of resolution in federal court "without disrupting the federal-state balance approved by Congress."  *Gunn,* 568 U.S. at 258.  Federal courts exclusively hear challenges to the DEA's authority to enforce the CSA against distributors, and litigating this case in a state court runs the risk of the state court applying federal requirements inconsistently with the manner in which the federal agency tasked with enforcing the CSA – the DEA – applies them.  Federal jurisdiction is therefore "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  *Grable,* 545 U.S. at 314.

56.    In summary, removal of this action is appropriate because Plaintiffs' "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable,* 545 U.S. at 314; *see also, e.g., PNC Bank, N.A.,* 189 F. App'x at 104 n.3 (state law claim based on violation of Internal Revenue Code "gives rise to federal-question jurisdiction" under *Grable*); *New York ex rel. Jacobson,* 824 F.3d at 315-318 (state law claims based on defendant's alleged violation of Internal Revenue Code satisfy *Grable*); *NASDAQ OMX Grp., Inc.,* 770 F.3d

---

[6]Less than two months after the MDL was created, Judge Polster convened the first day-long settlement conference on January 31, 2018.  Judge Polster required attendance by party representatives and their insurers and invited attendance by Attorneys General and representatives of the DEA and FDA.

at 1031 (state law claims premised on violations of Exchange Act "necessarily raise disputed issues of federal law of significant interest to the federal system as a whole"); *Gilmore v. Weatherford,* 694 F.3d 1160, 1176 (10th Cir. 2012) ("Although plaintiffs could lose their conversion claim without the court reaching the federal question, it seems that they cannot win unless the court answers that question.  Thus, Plaintiffs 'right to relief necessarily depends on resolution of a substantial question of federal law.'" (citation omitted)); *Broder,* 418 F.3d at 196 (state law claims premised on cable provider's alleged violations of Communications Act's uniform rate requirement satisfy "*Grable* test for federal-question removal jurisdiction"); *Sullivan*, 447 F. Supp. 2d at 1097 (recognizing that there are situations where primarily state law claims implicate a substantial and compelling federal judicial interest.").

57.    To the extent that the Court determines that some, but not all, of Plaintiffs' claims state a substantial federal question, the Court can evaluate whether to retain the non-federal claims against the Defendants under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367(a).

**V.    Other Removal Issues**

58.    In accordance with 28 U.S.C. § 1446(b)(2)(A), all defendants that have been properly joined and served in this action join in or consent to this removal.

59.    The following Defendants have been served in this action and consent to removal, while still preserving all defenses, including but not limited to defenses based on personal jurisdiction: Cardinal Health, Inc., Miami-Luken, Inc., CVS Health Corp.; CVS Pharmacy, Inc.; CVS Indiana, L.L.C., Rite Aid of Maryland, Inc., Amneal Pharmaceuticals LLC,  Abbott Laboratories, Abbott Laboratories, Inc., Mallinckrodt LLC, SpecGx LLC, Henry Schein, Inc., H. D. Smith, LLC f/k/a H. D. Smith Wholesale Drug Co., Anda, Inc., Noramco, Inc., Purdue Pharma L.P, Purdue Pharma, Inc., Endo Health Solutions Inc. and Endo Pharmaceuticals Inc., The Purdue Frederick Company, AmerisourceBergen Drug Corporation, Assertio Therapeutics, Inc., Walgreens Boots Alliance, Inc., Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica,

Inc. n/k/a Janssen Pharmaceuticals, Inc., Walmart Inc.; Wal-Mart Stores East, LP. Watson Laboratories, Inc.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Actavis Pharma, Inc.; Actavis LLC;*, See e.g., Proctor v. Vishay Intertechnology Inc*., 584 F.3d 1208, 1225 (9th Cir. 2009) ("[T]he filing of a notice of removal can be effective without individual consent documents on behalf of each defendant.  One defendant's timely removal notice containing an averment of the other defendants' consent and signed by an attorney of record is sufficient.").

60.    The following Defendants have not been properly served, and thus their consent to removal is not required: Amneal Pharmaceuticals, Inc. ("API"), Allergan, PLLC[7], Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler LefCourt, Kathe Sackler, Mortimer D.A. Sackler, Theresa Sackler, Mark Timney, Mallinckrodt PLC, Craig Landau, and Russel Gasdia.

61.    By filing this Notice of Removal, neither Kroger nor any other Defendant waives any defense that may be available to them, and Defendants expressly reserves all such defenses, including those related to personal jurisdiction and service of process.

62.    If any question arises as to propriety of removal to this Court, Kroger requests the opportunity to present a brief and oral argument in support of its position that this case has been properly removed.[8]

---

[7] Allergan plc, an Irish corporation, has not been served but nevertheless consents to removal out of an abundance of caution and expressly reserves all rights and defenses including those related to personal jurisdiction and service of process.  API has not been served.  It too consents to this removal, while simultaneously reserving all its defenses, including those based on personal jurisdiction and service.

[8] There has been no proof or affidavit of service filed in this case with respect to Defendant John Stewart.  The complete record (Composite Exhibit A) indicates that a summons was issued for John Stewart on June 18, 2019.  Counsel for Kroger was unable to locate any counsel for Mr. Stewart to inquire about personal service.  Counsel for Kroger reviewed other civil actions in federal and state courts and was only able to identify one attorney in Massachusetts who appeared on behalf of Mr. Stewart in a Massachusetts state court action.  That attorney did not return repeated phone calls or emails.  Based on available sources, Mr. Stewart appears to be the president of a medical marijuana company in Ontario, Canada.  Counsel for Kroger represents that all efforts of reaching Mr. Stewart or any counsel representing him have been exhausted, and that there is no evidence that Mr. Stewart has been served in this action.

63.     Pursuant to 28 U.S.C. § 1446(d), Kroger will promptly file a copy of this Notice of Removal with the clerk of the state court where the lawsuit has been pending and serve notice of the filing of this Notice of Removal on Plaintiffs.  Kroger reserves the right to amend or supplement this Notice.

Respectfully submitted this 16th day of August, 2019.

**GONZALEZ LAW, LLC**

*s/Dinita L. James*
by Dinita L. James, Partner

***Counsel for Defendants The Kroger Co.
and  Kroger Limited Partnership II, LP***

Original of the foregoing electronically filed
and copy served via U.S. Mail this 16th day
of August, 2019, to

Bryan R. Whitney
Whitney and Whitney, PLLC.
111 N. 4th St.
Kingman, AZ 86401
brw@abwhitneylaw.com
*Counsel for Plaintiffs*

Adam Weisman
Hinderaker Rauh & Weisman P.L.C.
2401 East Speedway Boulevard
Tucson, AZ  85719
adam@hrtucson.com
*Counsel for Henry Schein, Inc.*


  /s/*Elsa Chavez*
   Elsa Chavez

11202246.1